Opinion delivered March 17, 1888.

No. 2372.

## CHARLES MALCOLMSON *v*. THE STATE.

1. INDICTMENT—EMBEZZLEMENT.—In an indictment against the treasurer of an incorporated company for embezzlement of its money, the only description of the money was as follows: "Five hundred dollars, lawful money of the United States of America, of the value of five hundred dollars, a more particular description of which the grand jury can not give." The defense excepted to the indictment because it did not allege the names of the persons from whom the defendant received the said five hundred dollars, nor state whether the money was gold or silver coin, national bank or United States Treasury notes, or United States paper money authorited by law. *Held*, that the exceptions were properly overruled, the facts showing that the allegation of the indictment is as definite and specific as practicable.

2. SAME.—It is urged in this court that the indictment is insufficient because it does not allege that the money was "current" money. *Held*, in view of the facts of this case, that such an allegation was not necessary in this indictment.

3. EMBEZZLEMENT—EVIDENCE—CHARGE OF THE COURT.—In a trial for embezzlement of money by an officer of an incorporated company, it was not error to allow the State to prove that the accused, without authority, but with the company's money, bought and charged to the company a pair of horses and a set of harness, and afterward sold the same. Appellant, however, insists that such proof necessitated an instruction

to the jury not to convict for a conversion or sale of the horses and harness. But *held* that, the proof being competent for the purpose of tracing the company's money into the custody of the accused, and there being no purpose or attempt to convict him of a conversion or sale of the horses and harness, it was not incumbent on the trial court to instruct the jury as contended by appellant.

4. EVIDENCE—PRACTICE.—The admission of incompetent evidence over objection by the defense is not necessarily reversible error, unless there is an apparent probability that the evidence wrought injury to the accused. In the trial of an officer of an incorporated company for embezzlement of its money, the State, over objection by the defense, was permitted to adduce evidence of a fraudulent transfer by the accused and an ex-president of the company of certain land of the company in consideration of a number of shares of its valueless stock. *Held* (by a majority of the court), that this evidence had no relevancy to the issue in the case, and was calculated to prejudice the accused in the minds of his triers; wherefore its admission over objection was material error. Note the dissenting opinion of Willson, Judge, who regards the case as one of circumstantial evidence, and maintains that the evidence in question was relevant and competent as tending to show a fraudulent intent on the part of the accused.

5. SAME—PRACTICE IN THE COURT OF APPEALS.—In a case where there was such a conflict of testimony or such inconclusiveness of evidence as would have justified an acquittal, but in which a conviction would not be reversed in this court on account of the proof, the admission by the trial court over objection, of incompetent evidence, with but slight tendency to injure the accused or to place him in an odious light before his jurors is ground for a reversal of a conviction. See the statement of the case for a state of proof which is *held*, by a majority of the court, to bring this cause within the operation of the rule.

Appeal from the District Court of Parker. Tried below before the Hon. George A. McCall.

The appellant, who was the secretary and treasurer of a private corporation, known as the "Franco-Texan Land Company," was convicted under an indictment which charged him with the embezzlement of five hundred dollars in money, the property of the said company. The venue was laid and the trial had in Parker county, Texas. The verdict and judgment assessed the penalty against the appellant at a term of two years in the penitentiary.

The State introduced in evidence the charter of the "Franco-Texan Land Company," and then presented R. W. Duke as its first witness. He testified that he was the president of the Franco-Texan Land Company from some time in 1882 until December, 1885. The said company was incorporated under the

laws of the State of Texas, and, during the period named by the witness, had its principal office in Weatherford, Parker county, Texas. The defendant was elected to the office of sec. retary and treasurer of said company on the thirtieth day of July, 1885, for the period of one year. The defendant, by virtue of his said election, under the by laws of the said company, became the custodian of the books of the concern as secretary, and the receiver and custodian of its moneys as treasurer. During his occupation of the said office the defendant, either in person or through other agents of the company, received such moneys as were paid to the company. He kept the books of the company and made the entries therein, either in person or by O'Bierne, his father-in-law, or MacDermott, his wife's brother-in-law, who acted under his direction, supervision and control. The witness identified the by-laws of the company, which, at this stage of the proceedings, were read in evidence. Only those articles which relate to the duties of the secretary and treasurer are reproduced in this report, as they alone are important to the case. Title VI reads as follows:

"Treasurer and Vice Treasurer.

"Article 39. The Treasurer shall collect, receive and account for all the moneys of the Company.

"Article 40. The Treasurer of the Company shall be on duty at the principal office at Weatherford, Texas, and there shall be a Vice Treasurer of the Company, who may be on duty in Paris, France. And all checks drawn and all payments made at the principal office can only be drawn or made upon the written signature of both the President and Treasurer, attested with the seal of the Company. And all checks drawn and all payments made at the auxiliary office or agency in Paris, France, can only be drawn or made by the authority of the Board of Directors, upon the written signatures of both the Vice President and Vice Treasurer, attested with the duplicate seal of the Company.

"Article 41. The Treasurer shall immediately send all moneys collected to the Vice President in Paris, France, where the same shall be disposed of as directed by the Board of Directors.

"Article 42. The Treasurer, the Vice President and Vice Treasurer shall keep full and accurate account of the receipts and disbursements of all moneys and of all their transactions. The cash accounts shall be balanced at the end of each day."

"Title VII—Secretary and Vice Secretary.

"Article 43. The custody of the records is entrusted to the Secretary and Vice Secretary. They shall be responsible each for his own acts to the Board of Directors for the preservation of the records, and also for moneys received by them when performing the duties of Treasurer and Vice Treasurer." * * *

Continuing, the witness Duke testified that the defendant resided at Weatherford, and there conducted the business of his office. He had acted as secretary under the witness as president prior to his election in July, 1885, but until his said election, the witness usually received the moneys paid to the company, and deposited the same in bank, but subsequent to his election such moneys were paid to the defendant. Sometimes such moneys were actually paid to witness, O'Bierne or MacDermott—whoever happened to be in the office—but were turned over to defendant as treasurer. The moneys were received at Weatherford, Parker county, Texas, and in every instance were good and lawful moneys of the United States, some of them in gold, some in silver, and some in greenbacks, but all current moneys of the United States, of the value represented on the face of each separate coin or bill. Witness did not think that there was a large amount of money in bank to the credit of the company when the defendant took charge of his office on July 30, 1885. He could not state with any accuracy how much of the money of the company the defendant received during his incumbency of the office of secretary and treasurer (July to December, 1885), but he did not think that defendant received for the company as much as twelve or fifteen hundred dollars per month. It was customary, and it was the duty of the defendant, under the by-laws of the company, to remit the moneys received for the company to the vice-president of the company in Paris, France. The day book or journal, and the cash book of the company, kept by the secretary, were here exhibited to the witness. He identified them as the books in which the current transactions of the company were entered, and stated that he did not pretend to dispute, but admitted the correctness of the same. His attention was called to an entry in the cash book, in the hand writing of the defendant, dated August 1, 1885, showing a balance on that day, of fourteen hundred and sixty dollars in the safe of the company, and an entry in the company's bank or pass book, showing, on that day, a balance in favor of the company of three hundred and seventy-five dollars in the First National

Bank of Weatherford.  He said that he did not pretend to dispute the correctness of those entries, nor deny that the defendant, as treasurer, had in charge at that time the said sums of money for the company.  Witness could not state what disposition the defendant made of moneys belonging to the company which came to his hands as treasurer after his said election, but, if he misappropriated or misapplied any of such moneys, he did so without the authority of the witness.  Defendant bought a buggy and pair of horses with three hundred dollars of the company's money, and entered the same on the company's book. He made that purchase without the authority of the board of directors or of the witness as president.  Defendant used the said team on two or three occasions to show lands of the company, but witness regarded the said buggy and horses as the private property of the defendant.  He used the said team for his private purposes, and often for the accommodation or pleasure of his family.  Witness could not say how many remittances of money were made to Paris from July to December, 1885, while defendant was secretary and treasurer.  On November 27, 1885, witness as president and defendant as secretary and treasurer employed one Camille Henry to go to Paris, France, to investigate the matters of the company, and defendant paid the said Henry one thousand dollars of the funds of the company, making said payment without the authority of the board of directors.   The Baylor note for nineteen hundred and eighty dollars, which appears as a credit on the cash book of the date of November 18, 1885, was paid to the witness, and was the payment of a loan made by the witness to the company in Baylor's name, as he did not wish his own name to appear in the transaction. Witness's attention was here directed to an entry in the day book, signed E. O. B., which recited that fourteen hundred and sixty dollars was handed over to the secretary on August 1, 1885. He stated that the entry was in the hand writing of O'Bierne, the defendant's father-in-law, and was correct.  He stated that the deposits of the company were made exclusively with the First National Bank of Weatherford, and he was shown, identified and admitted as correct the entry in the pass book of August 1, 1885, showing the sum of three hundred and seventy-five dollars to the credit of the company.  Explaining the entries in said pass book, the witness said that, prior to August 1, 1885, he, as the president of the company, borrowed from the bank the sum of five thousand dollars; that during the month of August

one thousand dollars was paid on that loan, and the company's note for the remaining four thousand dollars was executed. At this point the company's cash book was introduced in evidence.

Continuing, the witness Duke testified that, on October 7, 1885, Judge Hood exhibited to him a telegram which purported to inform Judge Hood of witness's removal from the office of president of the company by the board of directors, and the appointment of Judge Hood as his successor. Witness thereupon wrote out his resignation and mailed it to the board of directors, but on the next day telegraphed the board withdrawing his said resignation. On the first day of December, 1885, witness relinquished the office of president to Judge Hood, and accounted to him for the moneys in his possession not entered on the books, which amounted to about five hundred dollars, and Mr. Gouthier paid witness his salary to the end of the year at the rate of one hundred and twenty dollars per month. The moneys referred to by witness were moneys that were paid to him by parties at Mineral Wells, where witness was then living. They were the only moneys belonging to the company which came into witness's hands, independent of the defendant, after he was elected secretary and treasurer.

Cross examined, the witness stated that in July, and in fact for a long time prior to the election of defendant on the last day of said July, he (witness) was the custodian of the moneys, although the defendant was the secretary of the company and kept the books, with the exception of the time that he (defendant) spent in France, which was in June, when the books were kept by O'Bierne, his father-in-law. It was the witness's custom to deposit moneys in bank on the day of collection, and hence he hardly thought it possible that he had as much as fourteen hundred and sixty dollars in the office safe when defendant took charge of the funds on August 1, 1885. He, however, could not swear that he never had as much as fourteen hundred and sixty dollars on hand and out of the bank at any one time.

Julius Royer, the next witness for the State, testified that he was the present secretary of the Franco-Texan Land Company. He did some work in the office of that company during the presidency of Mr Chaptive. He was familiar with the books of and with the company's system of business. Identifying the cash book, journal or day book, and the bank or pass book of the company, he said that they had been in his custody as secretary during the present administration. None of the original entries

in either of those books had been changed since the books came into the possession of the witness. After a careful examination of the said books, and after allowing the defendant credit for all disbursements appearing on the cash book, including the one thousand dollar item paid to Henry, and the three hundred and eighty-five dollars paid for the buggy and team, and twenty-nine hundred and fifty dollars seized by the company from the Citizens National Bank, he had found that the defendant was still behind with the company in the sum of three thousand four hundred and seventy-eight dollars and sixteen cents. And in this calculation he had allowed the defendant a credit of nearly nine hundred dollars which, upon subsequent investigation, he had found ought to have been charged against him, as it represented two deposits in bank of the company's money, one of four hundred and thirty-five dollars and fifty cents, and the other of four hundred and fifty-four dollars and sixty cents. The witness further testified that he was the book keeper of the First National Bank of Weatherford in August, 1885, and as such made the entry of August 1, 1885, in the company's pass book, showing a balance of three hundred and seventy-five dollars and two cents in that book to the company's credit, which was correct. The witness had carefully examined the day book or journal of the company as kept by the defendant, and had discovered that, after calculating the receipts and disbursements as entered by defendant, giving him credit for two thousand dollars remitted to Paris, as entered on the said day book, and comparing the two books together, the defendant would still be behind with the company in an amount exceeding fourteen hundred dollars, not including the nearly nine hundred dollars before mentioned; and that the journal or day book alone showed the defendant to be behind with the company in an amount exceeding twenty-five hundred dollars.

The State next introduced the parties whose names appear in the list below, and by them proved the payment of the sums of money set opposite their several names, all of which funds were paid during the treasurership of the defendant. All of said payments appear on the day book, except the sum paid by Hutchinson through Steffins, which was paid direct to defendant, the said payment being shown by defendant's indorsement on the draft. The sums paid by G. T. Walker and J. W. Plumlee were paid to defendant direct, and the other sums either to defendant, or to O'Bierne or MacDermott acting for defendant.

O. W. Steffins for D. C. Hutchinson...................$1,920 00
Wm. Sullivan.........................................  104 00
A. A. Parker.........................................   33 00
W. J. Worden, for Crosby & Worden................... 1,120 00
G. T. Walker.........................................  208 00
S. Wolfenberger, for Mrs. Lionberger................  156 00
J. W. Plumlee........................................   87 00
W. McKnought ($25 paid Bertollotti and balance remit-
   ted to company at Weatherford)...................  698 00
C. T. Ballenger......................................  119 00
Brazil...............................................   77 00

The State next introduced receipts signed by the defendant as
treasurer of the company, showing the payment to him for the
company by the parties named of the several sums of money set
out opposite their several names:

Terrell...............................................  $48 00
Miller................................................   26 00
Clark.................................................   31 00
Troumonger............................................   20 00
Wells.................................................   41 00
Dumain................................................  100 00
Kohn..................................................   60 00
Wolfenberger..........................................  100 00
Peters................................................   12 00
Young.................................................   68 00
Doss..................................................   52 00
Davidson..............................................   41 00
Sparks................................................   41 00
Taylor................................................   82 00
Ennis.................................................   34 00
Kindell & J...........................................   93 00
Fitchett..............................................  152 00
Frakes................................................   40 00
Lock..................................................   41 00
McKinnon..............................................  125 00
Laigle................................................    7 00
Baker.................................................   12 00
Kidwell...............................................   60 00
Clifton...............................................   32 00
Hill..................................................  201 00

Rogers..................................................$117 00
Simpson................................................ 98 00
Simmons............................................... 39 00
Freeman............................................... 3 00
Guerry................................................. 49 00
Goodhall............................................... 28 00

W. T. Brannon testified, for the State, that in December, 1885, he paid the defendant money for the Franco-Texan Land Company. When in Weatherford in September, 1886, attending court, the witness met the defendant, when defendant said to him: "What are you here for? I suppose it is to show that you paid the money for which you did not get your note. They need not be kicking about that, for I have plenty of money to pay all such matters. I have nine hundred and fifty dollars in one bank and one thousand nine hundred dollars in the other." The witness could not remember whether he said he had the nine hundred and fifty dollars in the Citizens National Bank, and the one thousand nine hundred in the First National Bank, or vice versa, but he said that he had nine hundred and fifty dollars in one and one thousand nine hundred and fifty dollars in the other bank.

C. H. Milliken was the next witness for the State. He testified that, during the year 1885, he was cashier of the First National Bank of Weatherford, in which bank the Franco-Texan Land Company kept its deposits. He identified the company's pass book and said that it showed correctly the company's transactions with the bank during the period covered by it. Referring to the entries in said book, the witness said that the five thousand dollar item, entered August 27, 1885, represented a past due note which the company owed the bank, and the one thousand dollar item of August 8, 1885, represents an amount applied to that note. A new note for four thousand dollars, being the balance, was then taken, and that is represented by the three thousand seven hundred and sixty dollar entry, the difference being the discount on the four thousand dollars. The five thousand dollar note fell due in July, 1885, and no other loans were ever made to the company by the bank. The four thousand dollar substitute note was paid by Judge Hood after he took charge of the affairs of the company. Witness had examined the books of the bank and could state positively that no remittance of money was made to Paris by the Franco-Texan Land

Company, or any of its officers, through said bank after July, 1885. The last remittance of two thousand dollars was made early in July, 1885. The stubs in the bank showed all the exchange bought. The money shown to the credit of the company in the said bank book in December, 1885, was all drawn out by the defendant. The entries of "November 27, 1885,—$2000," and "November 30, 1885,—$2003 54," represented drafts against the First National Bank drawn by defendant, which went to protest. All of the sums of money belonging to the company entered upon the pass book as drawn out of the bank, were either drawn out by the defendant in person as treasurer or by him and President Duke jointly.

W. W. Davis testified, for the State, that he became cashier of the First National Bank of Weatherford in February, 1886. The Franco-Texan Land Company then had no money in the said bank, and had placed none there since. The four thousand dollar note of the said company to the bank was paid after witness became cashier.

H. P. Hilliard, cashier of the Citizens National Bank, of Weatherford, testified, for the State, that, on October 25, 1885, the defendant deposited in said bank the sum of two thousand one hundred and ninety-one dollars and forty-seven cents. He made the deposit in his name, but stated that the money belonged to the Franco-Texan Land Company. He afterward deposited other sums for the company until his deposits aggregated the sum of two thousand nine hundred and fifty dollars. Prior to the first deposit mentioned, the defendant had never deposited money with said bank, nor did he ever deposit any after the aggregate of two thousand nine hundred and fifty dollars was reached. The transactions stated were the said bank's only transactions with the said company, save such as grew out of those particular deposits. Subsequent to these deposits the defendant attempted to draw them out of the Citizens National Bank through the First National Bank, but the former declined to pay the money out until it became satisfied that Judge Hood was the legal president of the company. The sum stated was not on deposit with said bank in September, 1886, nor was any other sum then on deposit with said bank, subject to the draft of the defendant. The bank books show three remittances of two thousand dollars each to Paris by the Franco-Texan Land Company, two of them in August and one in October, 1885. The draft for one thousand nine hundred and twenty dollars paid by

Hutchinson through Steffins at Abilene was used in buying exchange on Paris in October, 1885. Witness never paid defendant money on drafts, but gave him exchange on Paris for the same.

J. N. Haney testified, for the State, that in the spring of 1886 he purchased the Malcolmson buggy and horses mentioned in the testimony of Duke. He paid defendant for the same the sum of one hundred and fifty dollars, and assumed certain debts the defendant owed various parties.

A. J. Hood testified, for the State, that he was the president of the Franco-Texan Land Company. His official connection with said company began in 1885, witness serving first by appointment. On the third day of October, 1885, the defendant, who was then acting as secretary and treasurer of the company, handed the witness a telegram from Paris, France, which purported to come from the board of directors of the company, through L. Goybet, vice president of the company. A quorum of said board of directors were domiciled in Paris. The purport of the telegram was that the board had removed President Duke, and it contained a request that witness would telegraph whether or not he would accept the presidency of the company. Witness had never applied for the presidency of the company, nor authorized any person to apply for it for him. When witness received the said telegram, President Duke was at the Mineral Wells, in Palo Pinto county, and an immediate interview with him was impossible. Witness accordingly telegraphed the board of directors at Paris that he would accept the appointment. From that time witness claimed to be president of the company. Within a few weeks he received from Paris a resolution of the board of directors removing R. W. Duke from the presidency and appointing the witness in his stead. The said resolution was dated October 3, 1885, and was certified under the duplicate seal of the company by the vice president and vice secretary of the company. Mr. Duke returned to Weatherford on October 7, when witness exhibited to him the telegram from the board, when Duke said that he would write out and forward his resignation at once, and surrender the office to the witness. A few days later, Duke declined to surrender the office unless witness would pay him a full year's salary, or his salary until about December 10, 1885, which witness refused to do. Duke claimed to be president until about December 10, when he vacated the office and delivered to the witness the corporate seal and the

property of the company. From October 3, when the telegram was received, until about the middle of November, 1885, the defendant, then secretary and treasurer, refused to recognize Duke as president, but recognized the witness as such officer, and acted under him. During the said time defendant joined witness in a formal written notice to the First National Bank of Weatherford of the removal of Duke from the presidency of the company and the appointment of the witness to that office. He went with witness when witness delivered that notice to C. H. Milliken, cashier of said bank. Said notice reads as follows:

"To Sam'l H. Milliken,

"James H. Milliken,

"C. H. Milliken, and the First National Bank of Weatherford:

"You will please take notice that R. W. Duke is not the President of the Franco-Texan Land Company. He ceased on the 3rd instant to have any right or power to act in any way for said corporation, and no act, if any of his, performed in the future, will be binding on or recognized by the Company.

"A. J. HOOD,

"Pres't Franco-Texan Land Co.

"Attest: C. MALCOLMSON, Sec'y-Treas."

Continuing, the witness Hood testified that about the middle of November, 1885, a Frenchman named Edward Gouthier arrived at Weatherford from Paris, France. He brought letters to the witness from L. Goybet, the president of the board of directors, and the vice president of the company. Goybet's letters stated, in effect, that Gouthier was an expert book keeper, and that he was sent by the board of directors with plenary powers generally, and that he was especially empowered by the board to examine the books of the company in the Weatherford office. Witness and defendant had been notified in advance of Gouthier's arrival, of his mission, and when Gouthier arrived and exhibited his authority, the witness sincerely, and defendant apparently, received him kindly, and witness, in defendant's presence, told Gouthier to proceed with the examination of the company's books whenever he saw proper. Defendant did not then object. Up to that time the witness had never examined nor had anything to do with the books. Two or three days later the defendant came to witness and proposed that witness should

join him in sending Gouthier back to France. Witness asked him what was the occasion of his suggestion, and he said that he did not want Gouthier there overhauling his books, going through them and taking notes. Witness asked him what difference that could make. He replied that he did not intend for Gouthier to "get the dead wood" on him. Witness then remarked to the defendant that if the books were correct he had nothing to fear; that if they were not correct the directory had a right to know it, and that he could not join the defendant in stopping the investigation. In reply to this the defendant gave witness to understand that he was secretary of the company, and that he intended to take the books away from Gouthier and stop him from coming about the office. This interview between witness and defendant transpired in the law office of Hood, Lanham & Stephens. Defendant soon left, and Gouthier came to witness's said office, and for some days did not go about the company's office. It was not long after the arrival of Gouthier that the defendant became reconciled to R. W. Duke, and commenced insisting that he and said Duke were the real legal officers of the company. Thereupon witness and Gouthier jointly cabled the directory in France about the actual status of affairs. That cable was soon answered by one from the directory removing defendant and appointing Gouthier as secretary and treasurer. As early as November 19, 1885, the witness, as president of the company, published notices in the papers informing the public and all concerned that neither the defendant nor R. W. Duke had any official connection with the company.

A certain deed, bearing date November 24, 1885, was here put in evidence, and called to the attention of the witness. It purported to be a conveyance by the Franco-Texan Land Company, through R. W. Duke, as president, and C. Malcolmson, as secretary, to C. H. Milliken, of nine sections of the company's land —in all six thousand two hundred and forty acres—for the consideration of five hundred and twenty shares of the company's stock. So far as the witness knew, the Franco-Texan Land Company had never received a single share of stock, nor other thing of value for the said six thousand two hundred and forty acres of land. The deed to Milliken contained no specific description of any particular shares of stock, and witness had never been able, after careful search through all the effects of the company which came into his hands, to find any of said shares, and that the same were only recently found, as he was informed, in

the vault of the safe of the First National Bank. The said conveyance by Duke and defendant, as president and secretary respectively, of the land to said Milliken, was made without winess's knowledge or consent, and had never been ratified by the company through its board of directors or the witness. Defendant and his family occupied the building in which the office of the company was situated. When Duke, in December, 1885, turned over to the witness the property of the company then in his hands, he turned over, among other things, a large safe which was in the office. He opened all the drawers of the said safe except the one in which the money of the company was kept. The key to that drawer was in possession of the defendant as secretary and treasurer of the company. While the company's property was being delivered to witness by Duke, the defendant entered the office. Witness requested him to open the cash drawer of the safe so that the company's money might be counted in the presence of Mr. Duke and the sheriff— witness at the same time telling him that he only wanted the money counted in the presence of witnesses, and that he had no intention of removing it. Defendant refused to open the drawer or to count the money. Witness thereupon caused the doors of the room in which the safe was kept to be locked, and the windows secured with nails. Defendant had the combination of the safe. One of the doors of the safe room led into the room of the house occupied by the defendant and his family, and in which defendant kept some of the books and other property of the company. Witness did not know whether the defendant went into the safe after he, witness, left, but he had understood that the defendant caused a new lock to be placed on the door. The witness never opened that safe, nor authorized any person to open it. When, a short time afterwards, the safe and other property of the company was seized under a writ of sequestration sued out by the company against the defendant, no money at all was found in the said cash drawer to which, as stated, the defendant held the key. A small sum of money, was, however, found in one of the other drawers, to which Mr. Duke, when he turned the safe over to witness, gave the key. That money was found when the safe was seized by the sheriff under the writ of sequestration. That money amounted to between one hundred and twenty-five and one hundred and seventy-five dollars, and was known in the office as "file money." That money was deposited with the company by various parties, and was not paid

as collections on notes, or on the sales of lands. · It was the only money found by the sheriff when the property was seized under the writ of sequestration. In October, before the arrival of Mr. Gouthier, the defendant agreed to deposit the money he had on· hand in the Citizens National Bank, of Weatherford. Under instructions given him by witness, the defendant, late in October, 1885, deposited in the said bank the two thousand nine hundred and fifty dollars testified about by Hilliard, the cashier of said bank. The said two thousand nine hundred and fifty dollars and the file money found in the safe was all the money that ever came into witness's hands as president of the company. The one thousand four hundred and seventy-nine dollars of the company's money, which, as shown by the pass book, was in the First National Bank on the thirty-first day of October, 1885, was drawn out of said bank without the witness's knowledge or consent. Neither the witness as president, or otherwise, nor the company, ever consented to the payment of the one thousand dollars to Henry, nor did the witness ever consent to any other unauthorized use by defendant of any sum or sums of money belonging to the company. The following letter, which the witness stated was sent to him by the board of directors, from Paris, France, was next read in evidence.

"WEATHERFORD, October 28, 1885.

·" *Mr. L. Goybet :*

"DEAR SIR—I am in receipt of your valued favor dated the third instant. I see by the Paris postmark that it was mailed by you on the third instant, but it did not reach me until the twenty-seventh. I suppose there must have been some delay in the shipping.

"I remitted to Judge Hood the letter to his address, and he handed the other to Mr. Duke.

"Mr. Duke seems unwilling to vacate the office in spite of the order of the board. He pretends he can hold the office for one year, although the by-laws expressly gives the board of directors the power to remove any agent or officer they wish. On reading your letter he said that he would require proofs of the complaints set up against him. To my idea it seems that, leaving all his mismanagement out of the question, the one fault of being drunk all the time is quite sufficient for the removal of any officer in a respectable company, because, however little the affairs may depend upon him, it speaks badly for a company to

have such a head; hence the above reason ought to satisfy him, and if he should want to know it you might tell him so.

"Mr. Hood wrote to you last Saturday, giving you certain forms to fill up for his position, to make it legal in the courts. He also propounded a question concerning my being appointed president pro tem, on account of the fact of his not being a director like myself, and regarding his position as a lawyer defending the company's interest, and at the same time being its president. This question arises now from the fact of my refusal to exchange with Mr. Samuel Milliken for the Hittson shares.

"Mr. Duke, as I have already told you, is rather inclined to favor the Millikens—not that I have any proofs of the fact, but you can well understand how a person can judge such things without being told so in so many words. Mr. Duke asserts that he is always working to the company's interest, but being party to the affairs in the office, I do not see it in that light; at least I have my suspicions which I have a right to. For the foregoing reasons Judge Hood anticipates trouble from the Millikens, and he thinks he can better serve us as a lawyer than as its president—at least now. He wishes himself to conduct any suit brought against us, having defended us before, and now, having placed us on a legal footing himself, he understands the line of defense to adopt. Each article of our by-laws are supported by the laws of the state, and can not be shaken. Exchanges being made as they are asked for would make things easy, but I, as an employe, must and will make share holders comply with our rules, or else it is no use having any. Refusing to do to the contrary of course makes me the stumbling block to exchanges. A president, no matter what kind he may be, is still the executive head, and must act either one way or the other to the interests of the company throughout, or to those of outsiders. There is no medium to be adopted. Hence, I applied for Mr. Duke's removal, or rather for Judge Hood's appointment, having managed, as far as I was able, to keep things straight.

"You will have received and answered ere this Mr. Hood's cable of the twenty-seventh instant, which, although a lengthy is a most important one. We apprehend no trouble from Mr. Duke when we are in receipt of the documents demanded.

"Whilst writing the above, we are in receipt of your last cable accepting Mr. Duke's resignation. Mr. Hood has handed to him the same, and we await his answer. The accounts are all made

out, but I will wait until Judge Hood takes his seat so that he can approve them.   Yours respectfully,

C. MALCOLMSON."

The testimony for the State closing at this point, the defense introduced R. W. Duke as its first witness. He testified substantially as he did for the State as to his practice, while president, of making daily deposits in the First National Bank. The transactions involving the exchange of land to C. H. Milliken for stock took place in the back room of the First National Bank, and the witness supposed, until the day before his present testimony, that the said stock obtained from Milliken in exchange for the land, was turned over to and was received by Judge Hood when he succeeded to the presidency of the company. On the day before this testimony, however, Sam H. Milliken informed him that the said stock was still in the bank.

Cross examined, the witness said that he and defendant sent Henry to Paris to see what had become of the money they had previously remitted to L. Goybet, the vice president of the company. The appropriation of the one thousand dollars paid to Henry for the purpose stated, was after the trouble arose about the defendant's right to the offices of secretary and treasurer, and was not authorized by the board of directors. Henry never returned to Weatherford. Witness's salary as president was one hundred and twenty dollars per month. Defendant's salary as secretary and treasurer was one hundred dollars per month, and O'Bierne's was sixty dollars per month, and MacDermott's forty dollars—the latter two persons being assistants in the office. Witness received his salary up to the last of July, 1886. Defendant got no salary after December, 1885. The five thousand dollar note mentioned in the evidence was for money borrowed by the company from the First National Bank. One thousand dollars were paid on that note, and a new note for four thousand dollars, due at ninety days, was given. When C. H. Milliken exchanged stock for the land, he gave witness two hundred and fifty shares, which the witness supposed were canceled and were in the possession of the company, until the day before this testimony, when they were found in the bank's safe.

Sam H. Milliken testified, for the defense, that he was president of the First National Bank of Weatherford in 1885, and was present in the bank's office when President Duke of the

Franco-Texas Land Company exchanged some land with C. H. Milliken for some of the shares of the company. The books of the bank will show that the said C. H. Milliken bought the said shares from the bank and paid for them. C. H. Milliken's name does not appear in that transaction with the bank, but the said shares were indorsed in blank to him by the bank. Witness was not certain, but thought, that defendant was present when the exchange of the land for shares was made. At all events he joined Duke in the conveyance of the land to C. H. Milliken. The company at one time borrowed five thousand dollars from the bank, for which it executed its note. It paid one thousand dollars on said note, and executed its new note for four thousand dollars, with a vendor's lien as collateral security, and obtained an extension of time. The company, or its officers, frequently bought of the bank, exchange on Paris. The pass book would not show those transactions when the officers brought the money and paid it to the bank for the exchange. When money was drawn from the bank for the company, the checks were usually signed by Duke as president, and the defendant as treasurer.

A. d'Heur testified, for the defense, that he assisted in the transaction involving the exchange of the land for the Franco-Texan Land Company shares, mentioned by the witness Milliken, and made the calculations upon which the same was based. He had no recollection of witnessing the cancelation of the said stock. Witness consulted and advised with defendant about sending Henry to Paris, and encouraged the project. His object was to get certain facts laid before the board of directors, nine-tenths of whom lived in Paris, to the end that the Goybet administration might be overthrown. Witness wanted Goybet turned out of the vice presidency, in order that he could procure some exchanges of stock. Witness was a discharged employe of the Franco-Texan Land Company. Henry was sent to Paris after the question arose as to defendant's right to the office of secretary and treasurer. Witness had made more money out of the company since his discharge than he made as an employe.

The defense next read in evidence the receipt of C. Henry and the power of attorney from Duke and Malcolmson to said Henry to investigate the matters intrusted to him, as follows:

"Head Office of the Franco-Texan Land Company, Weatherford, Texas, November 25, 1885.

"Whereas, it appears from the books of the company now in the office thereof at Weatherford, Texas:

"That within the last two years there has been sent from this to the branch office in Paris, France, the sum or amount of sixty-five thousand nine hundred and eighty dollars—that is, three hundred and thirty-four thousand francs—and that the vice president in Paris has declared that there are now outstanding thirty-five thousand shares of the stock of said company:

"That the vice-president again demands funds of this office, and proposes to borrow fifty thousand dollars by mortgaging the lands of the company in Texas.

"That the Paris office has never sent to this office in Weatherford, Texas, an account of statement of the moneys expended over there:

"That it is also true that the vice president in Paris has, upon his own motion, and without authority from the board of directors, and without notice to them, attempted to remove the duly and legally elected president and secretary of the company in Weatherford, Texas, and has sent a delegate to this office authorized by said vice president to take possession of this office and the property of the company, and to forward its funds to Paris:

"That the office in Paris has repeatedly given order to this office to discount the notes of the company:

"That the officers here in lawful possession of the company's property and affairs have been shown powers of attorney executed in Paris, and sent here by the Paris office, authorizing a proxy to vote in the stock holders' meetings, shares that had long before the execution of said powers been surrendered for cancellation:

"That the vice president has authorized the employes of the company to retain commission on sales of the company's lands, and has ordered the lands of the company to be withdrawn from exchange, so that share holders can not exchange their shares for lands as the charter of the company provides, and is trying to bring about a change of the charter that will prevent exchanges at all. * * *

"That it is necessary that the books of the company in Paris should be removed to the office of Weatherford, Texas:

"*Now*, therefore, I, R. W. Duke, president of said company, and I, Charles Malcolmson, secretary of said company, consenting to and concurring therein, in order to protect the interests and rights of the share holders in the said company, and in order to enable them to present to said share holders a full and

complete statement of the affairs of the company, do hereby authorize and empower Mr. Camille Henry, as lawful agent of the company, to proceed to Paris, France, and there as such agent, and for said company, to take into his possession such books and records of the company as are now in the Paris office, and bring them to this office; and if he can not legally do this, then to make a complete examination of them, taking copies and doing all such other legal and proper things as may be necessary to protect the rights of the share holders, and to prepare and present to the share holders in France a statement showing the condition of the affairs of the company, and how the funds have been used in Paris. The said Camille Henry is hereby fully empowered and authorized to act for the company in any lawful way to effect the object herein expressed.

"In witness whereof I do hereby affix my name as president of the said company, and cause the seal thereof to be affixed with the attestation of the company's secretary, the day and date just above written.

"THE FRANCO-TEXAN LAND COMPANY,

[SEAL]    Attest:                    "R. W. DUKE, President.

"C. MALCOLMSON, Secretary-Treasurer."

The above power of attorney was acknowledged before E. P. Nicholson, notary public, Parker county, Texas, his certificate bearing date November 26, 1885.

W. W. Davis, recalled for the defense, produced a bundle of shares of the Franco-Texan Land Company, which he testified were taken from the vaults of the First National Bank of Weatherford. Each share was marked across the face in red ink: "Cancelled, C. M." Witness for the first time found the said shares in the vault of the said bank of which he was cashier. C. H. Milliken's name did not anywhere appear on any of the said shares, nor did the books of the First National Bank show that C. H. Milliken ever paid said bank anything for the said shares. The shares were payable to bearer.

H. MacDermott testified, for the defense, that while the defendant was secretary and treasurer of the Franco-Texan Land Company, he, witness, was a clerk in the office of said company. He identified the day book and journal of the company, which was in evidence. The calculation now in witness's hands, made by witness and defendant from the books of the company, shows the transactions of the company during the months of August,

September, October, November and December, 1885. According to that calculation, the disbursements for the company during the months stated, exceeded the receipts by about eighteen hundred dollars.

Cross examined, the witness said that his wife and the wife of the defendant were sisters, and were daughters of E. O'Bierne. According to the calculation made by defendant since the beginning of this trial, verified by witness, the disbursements for the month of August, 1885, exceeded the receipts about five thousand dollars, and to reach that result the item of five thousand dollars entered as of August 26, was computed as a disbursement. The item entered on the last day of July as follows: "Handed over to secretary, August 1, 1885, balance in safe, $1460.40, E. O. B.," was not computed, nor was the item of three hundred and seventy-five dollars and two cents in the bank or pass book computed. Witness was not in the office then, and knew nothing about those items. All moneys paid to the witness for the company during his employment were turned over by witness to the defendant. O'Bierne, at the time of this trial, was in Atoka, in the Indian Territory, where he had temporary employment. Defendant had control of everything about the office during witness's service in the company. Most of the entries in the company's books were in the defendant's hand writing, and a few were in the handwriting of O'Bierne, who was a correct book keeper.

At this point the defense introduced in evidence a letter from O'Bierne, stating that he had no money to pay his way from Atoka to Weatherford, and that his employer was absent and unwilling that he should leave Atoka to go to Weatherford to attend this trial.

James Lamar testified, for the defense, that during defendant's term of office as secretary and treasurer of the company, he, witness, acted as agent for the company at Millsap. All amounts collected by witness for the company were paid into the company's office in Weatherford, either to defendant, O'Bierne or MacDermott, and were promptly entered on the books.

E. P. Nicholson testified, for the defense, that he was the attorney of the defendant at the time of his alleged removal from office as secretary and treasurer of the company. When the matter was first submitted to him by defendant, witness advised him to hold on to the office and property until better evidence of his removal was forthcoming; that he could not be legally re-

moved on a mere telegram, and that, pending his legal removal by the proper authority, he was the legal custodian of the moneys, books and papers of the company.

Sam H. Milliken, recalled by the defense, testified that he and H. P. du Bellet had made a joint calculation from the books in evidence, and that from that calculation it appeared that the receipts of the company from August 3, 1885, to December —, 1885, inclusive, exceeded the disbursements for the same period to the amount of fourteen hundred and eighty-nine dollars and thirty cents. That computation did not include the item of fourteen hundred and sixty dollars and forty cents placed in the company's safe on August 1, 1885, nor the three hundred and seventy-five dollars shown in the pass book, nor did it include the twenty-nine hundred and fifty dollars and forty-seven cents deposited by defendant in the Citizens National Bank on the twenty-fourth day of October. This witness, when recalled by the State, admitted that in that calculation there was a mistake made in defendant's favor of one thousand dollars.

H. P. du Bellet, for the defense, corroborated the witness Milliken as to the calculation described by Milliken, and stated on cross examination that if the five thousand dollars of August 28 was paid by one thousand dollars cash and the four thousand dollar note described by previous witnesses (matters about which he was not informed), then there was an error of one thousand dollars in that calculation in favor of the defendant.

*A. T. Watts, E. P. Nicholson* and *L. F. Smith* filed an able and exhaustive brief and argument for the appellant, which is necessarily too lengthy for insertion in this report.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant Malcolmson was convicted at the June term of the district court of Parker county of the offense of embezzlement, from which conviction he appeals here and by counsel assigns numerous errors for a reversal of the judgment.

Several objections are urged to the sufficiency of the indictment, some of which will be noticed, to wit: 1. That said indictment fails to allege the names of the persons from whom the five hundred dollars were received by the defendant. 2. That it does not state the kind of money received, whether said

money was gold, silver coin, National bank or treasury notes of the United States, or whether the same was United States paper money authorized by law. Under the facts of this case, the indictment alleging that a more particular description of said money can not be given, we hold the indictment sufficient.

The record shows that the Franco-Texan Land Company was organized on July 25, 1876. At a meeting of the share holders of the company on the thirtieth of July, 1885, appellant was elected its secretary and treasurer. This position he held until some time in December, 1885. By virtue of the by laws of said company, the secretary and treasurer was the custodian of the books of the company, and received the moneys of the same. Appellant took charge of the money belonging to the company when elected, and he received moneys from all sources as treasurer, until he was superseded by another treasurer, some time in December, 1885.

Under this state of case it would be very remarkable, indeed, if the prosecution could, with any degree of certainty, show the character of moneys, or from whom they were received, etc. This would, in most of such cases as this, be a moral impossibility; and to hold that the indictment should allege and the State prove these facts would be monstrous. The result of such a doctrine would protect from just punishment those whose guilt could be made absolutely evident by the clearest proof. The indictment alleges that appellant embezzled "five hundred dollars lawful money of the United States of America of the value of five hundred dollars, a more particular description of which the grand jury can not give." Under the facts of this case, this is all that could have been alleged with certainty or safety.

It is urged in the brief of counsel for appellant that for the offense of embezzlement of money, the indictment must charge that the money was *current money,* citing us to Williams v. The State, 5 Texas Court of Appeals, 116; Black v. The State, 44 Texas, 620, and Boyle v. The State, 37 Texas, 359. In some cases such a description might be necessary, but not in cases like this.

There was evidence introduced by the State showing that appellant, without authority, purchased two horses and a set of harness, charging the same to the company. There was also evidence introduced by the State, over objection of defendant, showing that appellant sold the same to Jasper Haney. In this there was no error. This property was purchased with funds of

the company, and the money obtained from Haney by its sale belonged to the company, and went into the hands of appellant, he being responsible for it to the company as its treasurer; and if he embezzled it he should be held criminally liable.

It is objected that the court failed to instruct the jury that they could not convict appellant for a conversion of the horses and harness or for a sale of the same by him. There was no attempt to convict him for either of those acts. This transaction was shown for the purpose of proving that appellant received from this source a certain amount of money for which he was responsible to the company. It went to make up the grand total received by him as treasurer of the company.

Over objection of appellant, the State read in evidence a deed from the company, signed by R. W. Duke as president, and attested by appellant as secretary, conveying to C. H. Milliken nine sections of land situated in Nolan county for five hundred and twenty shares of the capital stock of said company. Appellant was on trial for embezzling the money of the company. What legitimate purpose the exchange of the company's land for stock could serve we can not perceive. In the brief for the State it is urged that this transaction was fraudulent; that the company received in fact nothing for the nine sections of land; that the deed was executed after Duke ceased to be president of the company, which fact was known to appellant, etc.

There is evidence showing that this transaction, to say the least of it, was not at all profitable to the company. If not fraudulent in fact, it was sought to be made so to appear to the jury. There was no fact in this record legitimately bearing upon the case being tried, which was, in our opinion, in the slightest manner elucidated by this land transaction. It was not in itself competent evidence tending to prove the embezzlement, nor did it tend remotely to explain any material fact in the case. Its effect, therefore, was to place appellant before the jury as a corrupt man, capable of committing at least a fraud upon the rights of the company for which he was then the secretary and treasurer.

This land and stock transaction was foreign to this prosecution, and to meet which it is not at all probable that appellant was prepared, and its development to the jury was unquestionably calculated to prejudice his case with those called upon to pass on the really material facts of the case. (See this subject elaborately discussed in The State v. Lapage, 57 N. H., 245; see

also 1 Phillips's Ev., 7 ed., 181; Starkie's Ev., 490; 1 Chitty's Crim. Law, 504; The State v. Rentor, 15 N. H., 169; Shaffner v. Commonwealth, 72 Penn., 60.) We are cited by the State, in support of the admissibility of this transaction in evidence, to Leonard v. The State, 7 Texas Court of Appeals, 417, and to Cole v. The State, 16 Texas Court of Appeals, 461. Neither of these cases has any bearing upon the matter under consideration.

While this transaction was not competent evidence, it does not follow that the judgment must of necessity be reversed, for it is not every error of this sort, namely the admitting of incompetent evidence, which works a reversal of the judgment. There must be probability of injury to the accused. On the other hand, when we look to the use which this matter was made to serve, there can be no question of its damaging effect upon the cause of defendant. This being the case, this court will not pause to consider the extent of the wrong, but will reverse the judgment.

Let us view this matter from another standpoint. We have repeatedly read the facts of this case, earnestly endeavoring to understand them clearly, and if we do comprehend them then we are not perfectly satisfied that they show appellant's guilt with reasonable certainty. We can not with perfect safety and certainty place our finger on the facts which reasonably show that the defendant embezzled any of the money of the company. We are not to be understood as holding the evidence insufficient to support the verdict. All we mean to say is that the facts leave some doubt in our minds of the guilt of the appellant— that the case is not perfectly free from doubt; that it is left at least in *some* uncertainty, and that the guilt of appellant is not rendered so clear and certain as to render harmless the land and stock transaction. If, therefore, in a case where there is a conflict of testimony, or a case in which the jury would be justified from the meagreness or uncertainty of the evidence, in finding a verdict of not guilty, and still the evidence is such as to require an affirmance of the judgment by this court if the jury should convict, the admission of incompetent evidence with the slightest tendency to injury, or to place the accused in an odious light before his jurors, should and will be ground for a reversal of the judgment.

We are of the opinion that under the facts of this case there was error in admitting this matter in evidence, calculated to

work serious wrong to the appellant, for which the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered March 17, 1888.

### Dissenting Opinion of Willson, Judge.

Willson, Judge.    I do not concur in the opinion of the majority of the court that it was error to admit the testimony relating to the land and stock transaction.  I think that testimony was admissible.  This is a case of circumstantial evidence. Every fact which tends to throw light upon the transaction; which is even remotely connected with the crime charged; which, even though slightly, tends to develop the *animus* of the defendant—his good or bad faith with reference to the funds and business of the company of which he was an officer, is admissible against or for him.    When the inculpatory evidence is circumstantial in its nature, the mind seeks to explore all sources from which light, however feeble, may be derived.  In the investigation of such cases, therefore, greater scope is allowable than when the evidences is direct and positive.  (Washington v. The State, 8 Texas Ct. App., 377; Sims v. The State, 10 Texas Ct. App., 131; Preston v. The State, 8 Texas Ct. App., 30.)

It seems to me that the transaction with regard to the land, throws some light upon the charge of embezzlement.  The land was the property of the company, a part of its assets.  Defendant joined the ex-president of the company in conveying this land to one Milliken for the stock of the company, which stock was valueless.  Defendant knew at the time he joined in this conveyance, that the ex-president had no authority to dispose of said lands.  It was an attempted fraud upon the company, and defendant knew it was a fraud, and the evidence is pretty strong that he intended it as a fraud at the time.  A fair inference from the evidence bearing upon this transaction is, I think, that Duke, the ex-president, Milliken and the defendant were acting together in concert, to deprive the company of these lands.  Who was to be benefited by the transaction does not clearly appear from the evidence, except that Milliken was getting the lands for a valueless lot of stock in the company, and it is reasonable to suppose that Duke and the defendant were promised or expected a fair divide in case the scheme should succeed.  Now, I ask, does not this transaction tend to show

the attitude of the defendant to the company at that time? Does it not tend to show that he was not cautiously guarding the interests of the company as it was his duty to do? Does it not tend to show that he was not only willing, but was intending and aiding to appropriate wrongfully, without authority, the assets of the company? Does it not tend to show system, design, scheming on his part to defraud the company? Does it not tend to show a fraudulent, corrupt intent on his part with respect to the property and interests of the company? It appears to my mind that it has such tendency, and is therefore pertinent and relative to the issue, as much so as any other circumstance proved.

In my opinion there is no error in the conviction, and I think the judgment should be affirmed.